MYRA A. PRICE *et al.*

*v.*

THE DIME SAVINGS BANK *et al.*

| 124 | 317 |
| 30a | 548 |
| 124 | 317 |
| 46a | 419 |
| 124 | 317 |
| 81a | 633 |

*Filed at Ottawa March 26, 1888.*

1. PLEDGE—SURETYSHIP—*pledge for the debt of another—change in the contract of principal—extension of time—release of surety or pledge.* Where a third person pledges his property as a security for the payment of a debt or obligation of another, such property will stand in the position of a surety of the debtor, and any change in the contract of the principal which would discharge a surety, will operate to release and discharge the property so held as collateral. This rule also applies to mortgages made by one person to secure the debt of another.

2. After the pledge of bank stock belonging to A, to secure a debt of B to C, a settlement was had between B and C, and B gave C new notes falling due at later dates, and B left the bank stock as security for the new notes without the knowledge or consent of A: *Held,* that the change in the terms of the original contract without the consent of A, was sufficient to release his undertaking that his property should stand as security for its performance.

3. Where, however, a debtor pledges collaterals of his own as security for the payment of a note or bill, the extension of the time of payment will not extinguish his creditor's lien on the collaterals.

4. If a creditor, by a valid and binding agreement, without the assent of a surety, gives further time for payment to the principal debtor, the surety will be discharged.

5. CONSIDERATION—*for extension of time of payment.* The surrender of old notes secured by a pledge of collaterals belonging to a third person, and the cancellation of such notes, is a sufficient consideration for the giving of new notes of the principal debtor, payable at a certain date, and such surrender and cancellation will put it out of the power of the creditor to enforce payment of the old notes before the maturity of the new notes.

6. REMANDMENT OF CAUSE—*whether necessary.* Where the Appellate Court reverses a decree of the trial court on the merits, holding there can be no recovery, it will not be necessary to remand the cause for further proceedings. If the grounds of the reversal, however, do not go to the extent of denying a right of recovery, the cause may properly be remanded.

APPEAL from the Appellate Court for the Second District;— heard in that court on appeal from the Circuit Court of Bureau county; the Hon. GEORGE W. STIPP, Judge, presiding.

This is a bill filed in the circuit court of Bureau county, by Myra A. Price and Lydia A. Cramb, against Henry C. Reed, Eugene C. Bates, his conservator, the Illinois Trust Company, William K. Reed and the Dime Savings Bank, seeking to have fifty shares of the stock of the Dime Savings Bank declared subject to a lien for the payment of a certain note of Henry C. Reed, and a decree for the sale of such stock.

In May, 1872, Levi Kelsey, George M. Price, Lydia A. Cramb and E. S. Kelsey sold to Henry C. Reed, a nephew of Levi Kelsey, one hundred and sixty-six shares of stock of the Illinois Land and Loan Company, for the sum of $16,600, to be paid in one year, and, as security for its payment, took from said Henry C. Reed an assignment of one hundred shares of stock in the Princeton Loan and Trust Company. On November 30, 1872, the amount due the several vendors had been paid, except the sum of $7331, which, by an arrangement between themselves, remained due to Levi Kelsey. To settle this, Henry C. Reed gave to Levi Kelsey his four promissory notes of that date, bearing ten per cent interest,—the first for $1200, due in one year, the second for $1600, due in two years, the third for $2000, due in three years, and the last for $2531, due in four years, to secure which Henry C. Reed gave Kelsey various collaterals, which, from time to time, to suit the convenience of the parties, were exchanged for other collaterals.

On August 7, 1874, Henry C. Reed, who lived at Princeton, Illinois, wrote the following letter to his brother, William K. Reed, living in Chicago: "I wish you would send me the mortgage of which you spoke, right away, for I wish to get the Gudgell mortgage for the bank as soon as I can. I also wish you would send me $200." August 21, 1874, Henry C. again wrote said William K., as follows: "Yours bringing the mortgage of a thousand dollars, indorsed to Walter Lister, and also a draft for $200, was quite timely. I went up to Mendota, Tuesday, and took up the $2000 mortgage made by

Gudgell, and also one note, coming due September 1, for $500, of the J. G. Reed mortgage. I also got of Levi my stock, which was left with him to secure your Ill. L. & L. Co. matter. I have sent to George M. Reed the stock of Ill. L. & L. Co., twenty-three shares, and I suppose he has now got all of mine and Burnham's, has he not? If any is yet lacking, have him write me the number of certificate and number of shares. I expect I shall come up there some day next week, and settle up tax matters and other things with the Ill. L. & L. Co. It ought to be brought up to the first of last January, anyhow. I will then bring up the scrip, and trade for mortgages," etc.

It does not appear that Levi Kelsey had any knowledge of the writing or existence of these letters, but on October 16, 1874, William K. Reed wrote to said Kelsey, as follows: "Michael Buehler, whose note and mortgage you hold as collateral to H. C. Reed's agreement, wishes to take up his note of $1000, and have the mortgage released. I send you certificate No. 12 of the Dime Savings Bank, for fifty shares stock, *belonging to me*, to hold in place of the mortgage. If agreeable, please return the note and mortgage to me." In reply of date October 17, 1874, said Levi wrote to Henry C. Reed, as follows: "Henry, I have just received a letter from William K. Reed, asking me to send him the last mortgage that you left with me, and also a release of it, as the man wants to pay it. The release should be made by Walter Lister, if he can be found. William sends me fifty shares Dime Savings Bank to hold in lieu of it. Shall I send it? * * * Write me what I shall do about the mortgage," etc. October 23, 1874, Levi Kelsey wrote to William K. Reed, as follows: "I received yours last Saturday, and wrote to Henry about sending the mortgage to you, and did not hear from him until yesterday. Inclosed I send the note and mortgage asked for, but no release, as it should be released by Lister, if he can be found."

It further appears, that on July 11, 1873, Michael Buehler gave his two promissory notes to Walter Lister, each for $1000,

payable in one and two years, with six per cent interest, se-cured by mortgage on real estate. The notes and mortgage were indorsed in blank and guaranteed by Lister, and on February 2, 1874, they were sold and delivered to the Illinois Land and Loan Company, and by that company, May 16, 1874, were transferred to the Dime Savings Bank. At the time William K. Reed sent the Buehler note and mortgage to Henry C. Reed, the first note had been paid. The second of these notes shows, by the indorsements thereon, its guaranty by Lister, and its payment October 1, 1874, to "Wm. Kelsey Reed, cashier." William K. Reed was a stockholder in the Dime Savings Bank, and its cashier. On December 1, 1876, there remained due on the notes of Henry C. Reed to Levi Kelsey $4600, for which Henry C. Reed, at that date, gave his five promissory notes to said Kelsey,—the first for $600, due in one year, the others for $1000 each, payable in two, three, four and five years, all bearing ten per cent interest, and took up and cancelled his note of November 30, 1872. The bank stock before referred to was again pledged to Kelsey, as collateral to these last five notes by Henry C. Reed, the certificate remaining with Kelsey, as before.

October 21, 1879, these five notes of December 1, 1876, were taken up by Henry C. Reed, and four new notes were given by him to Kelsey for the sum then due,—the first for $300, due on demand, the second for $1000, payable in one year after date, the third for the same amount, payable two years after date, the fourth for a like amount, payable three years after date, all bearing eight per cent interest. Kelsey still retained the certificate of the fifty shares of the bank stock, with other collaterals, as security for the payment of these four notes. Levi Kelsey died testate, in December, 1879. George M. Price became his executor, and complainants, Myra A. Price and Lydia A. Cramb, were his residuary legatees.

On May 13, 1881, the four notes last named were cancelled and delivered up to Henry C. Reed by said executor, and the

three notes sought to be collected herein were executed by Henry C. Reed, for the balance due on said four notes. The three notes bear date May 13, 1881. One is for $1600, payable to the order of Myra A. Price one year after date, one was for a like sum, payable to the order of Lydia A. Cramb one year after date, and the third for $174.66, payable to Price, as executor of Kelsey, six months after date, and indorsed by Price to Myra A. Price and Lydia A. Cramb. Henry C. Reed pledged the same bank stock, with other collaterals, as security for the payment of these notes.

There is no proof in the record that William K. Reed, the owner of such bank stock, ever consented to the several renewals mentioned, or the extension of time of payment to Henry C. Reed, or that he ever ratified the same, unless that may be inferred from his delay in asserting his rights.

William K. Reed and the Dime Savings Bank severally answered, setting up that the certificate of fifty shares of bank stock belonged to William K. Reed, and had been sent by him to Levi Kelsey to hold as collateral security for the notes of Henry C. Reed to said Levi Kelsey, executed in 1872; that the certificates had never been transferred by William K. Reed; that it had been pledged by William K. Reed to Levi Kelsey, in lieu of the $1000 Buehler note and mortgage; that the various extensions of time and renewals allowed by Kelsey and his executor had been without the knowledge or consent of William K. Reed, and that by such renewals and extensions the fifty shares of stock became released from any lien as security for the note given by Henry C. Reed to the appellants. Upon hearing, a decree was rendered finding due the complainants, after the sale and application of the stock of the Illinois Trust Company, the sum of $4246.12, which was declared a lien on the said fifty shares of stock of the Dime Savings Bank, and a sale thereof was ordered, to satisfy the decree. From this decree William K. Reed and the bank appealed to the Appellate Court for the Second District. That court reversed the

21—124 ILL.

decree of the circuit court, and remanded the cause, with directions to dismiss the bill. Complainants below bring the case to this court by appeal. The other facts material to a full understanding of the case appear in the opinion.

Mr. F. P. Snyder, and Messrs. Mayo & Widmer, for the appellants:

An extension of time by Kelsey would not have released the Buehler mortgage, having been placed with him, and owned, for aught that is known, by Henry C. Reed, for his debt. Then the legal *status* of the substituted collateral is the same as that for which it was exchanged. Therefore, the renewal of the note by Henry C. Reed did not discharge the bank stock. *Goodman* v. *Simons*, 20 How. 343; *Park Bank* v. *Watson*, 42 N. Y. 490; Jones on Pledges, secs. 89, 90, 541; *Darst* v. *Bates*, 51 Ill. 439; *Bond* v. *Insurance Co.* 106 id. 656; *Manning* v. *McClure*, 36 id. 490; *National Bank* v. *Cheeney*, 87 id. 602.

A pledge is a security for the whole and for every part of the debt, unless otherwise stipulated. *Baldwin* v. *Bradley*, 69 Ill. 32; Story on Bailments, sec. 301.

A waiver of any legal or equitable right, at the request of another, is a sufficient consideration to support a promise. *Miller* v. *Hawker*, 66 Ill. 185; *Buchanan* v. *Bank*, 78 id. 500.

The delivery of the certificate assigned in blank, was sufficient to pass the equitable title to the pledgee. *Kellogg* v. *Stockwell*, 75 Ill. 68; *Otis* v. *Gardner*, 105 id. 436; Jones on Pledges, secs. 163, 165, 168, 169.

The death of the pledgor will not revoke the pledgee's authority to fill up a transfer to himself or another. Then why should the death of the pledgee? Jones on Pledges, sec. 166.

Mr. Allan C. Story, for the appellees:

The attempted assignment of the Dime Savings Bank stock certificate to Levi Kelsey was void, and any authority to make a transfer of such stock ceased at his death. *Chase* v. *Palmer*,

29 Ill. 306; *Whitaker* v. *Miller,* 83 id. 381; *Wilson* v. *South Park Comrs.* 70 id. 46; *Gage* v. *Chicago,* 2 Bradw. 332.

A power of attorney is revoked by the death of either the agent or principal. *Risley* v. *Fellows,* 5 Gilm. 531.

The bank was released from all liabilities by the acts of George M. Price and Levi Kelsey in extending the time of payment. If a debtor pledges collaterals belonging to himself for the payment of a note, and afterwards gives a renewal note, or extends the time of payment, the lien on the collateral is not extinguished. *Bank* v. *Bank,* 35 Ohio St. 208; *Moses* v. *Trice,* 21 Gratt. 556; *Pinney* v. *Kimpton,* 46 Vt. 80; Jones on Pledges, sec. 541.

An extension of the time of payment to a debtor by a binding contract, will release collaterals of a third person pledged as security for the payment of the debt. *Burnap* v. *Bank of Potsdam,* 96 N. Y. 125; *Bank of Albion* v. *Burns,* 2 Laws, 52; 46 N. Y. 170; *Smith* v. *Townsend,* 25 id. 479; *Gahn* v. *Niemcewick,* 11 Wend. 312; *Calvo* v. *Davis,* 8 Hun, 222; 73 N. Y. 212; *Hawley* v. *Bradford,* 9 Paige, 200; *Rowan* v. *Manufacturing Co.* 33 Conn. 18; *Loomer* v. *Wheelwright,* 3 Sandf. Ch. 148; *Vartie* v. *Underwood,* 18 Barb. 561; *Steele* v. *Lord,* 28 Hun, 27.

The like rule applies where a person pledges his property as collateral security for the performance of a contract of a third person. Such property stands in the position of a surety, and any changes in the contract of suretyship which would discharge a surety, discharges the property held as collateral security. So where land subject to a judgment lien is sold by the judgment debtor to a third person, for its full value, it is regarded as standing in a suretyship relation, and is subject to be discharged from such lien, like any other collateral security, by the affirmative acts of the creditor or by his gross negligence. *Burnap* v. *Bank of Potsdam,* 96 N. Y. 125; *White* v. *Ault,* 19 Ga. 551; *Rowan* v. *Manufacturing Co.* 33 Conn. 18; *Barnes* v. *Mott,* 94 N. Y. 397; *Christner* v. *Brown,* 16

Iowa, 130; *Ryan* v. *Town of Shawneetown,* 14 Ill. 20; *Crawford* v. *Richeson,* 101 id. 351; *Denison* v. *Gibson,* 24 Mich. 187.

Mr. JUSTICE SHOPE delivered the opinion of the Court:

There can be no question that the certificate of fifty shares of stock in the Dime Savings Bank was the property of William K. Reed, and that Kelsey had notice of that fact when he accepted the same as collateral security for the payment of Henry C. Reed's note of November 30, 1872, in lieu of the Buehler note and mortgage. When a third person pledges his property as a security for the payment of a debt or obligation of another, such property will stand in the position of a surety of the debtor, and any change in the contract of suretyship which would discharge a surety, will release and discharge the property so held as collateral. This rule also applies to mortgages made by one person to secure the debt of another. *Burnap* v. *National Bank of Potsdam,* 96 N. Y. 125; *Rowan* v. *Sharpe Rifle Manufacturing Co.* 33 Conn. 18; *White* v. *Ault,* 19 Ga. 551; *Barnes* v. *Mott,* 64 N. Y. 397; *Christner* v. *Brown,* 16 Iowa, 130; *Ryan* v. *Town of Shawneetown,* 14 Ill. 20; *Crawford* v. *Richeson,* 101 id. 351; *Bank of Albion* v. *Burns,* 46 N. Y. 170; Colebrook on Collateral Securities, sec. 239.

The rule is well settled in this State, that if a creditor, by a valid and binding agreement, without the assent of a surety, gives further time for payment to the principal debtor, the surety will be discharged. *Dodgson* v. *Henderson,* 113 Ill. 360; *Davis* v. *People,* 1 Gilm. 409; *Waters* v. *Simpson,* 2 id. 570; *Crossman* v. *Wohlleben,* 90 Ill. 537; *Myers* v. *Bank,* 78 id. 257; *Danforth* v. *Semple,* 73 id. 170; *Montague* v. *Mitchell,* 28 id. 481; *Kennedy* v. *Evans,* 31 id. 258. See, also, Brandt on Suretyship, secs. 301, 304, 307; Bayliss on Sureties and Guarantors, 240, *et seq.*

The surrender of the old notes, and their cancellation, was a sufficient consideration for the new notes given, and the holder, by such surrender and cancellation, put it out of his power to

sue on the indebtedness or enforce its collection until the maturity of the new notes. After the pledging of the certificate of the bank stock in October, 1874, as collateral security, Kelsey, the creditor, on December 1, 1876, had a settlement with Henry C. Reed, the debtor, on which it was found there was a balance of $4600 due from the latter to the former upon the original indebtedness, and new notes, extending the time of payment for five years, were taken by Kelsey for such balance, and the note for the payment of which this collateral was pledged, was cancelled and surrendered. To this, William K. Reed is not shown to have consented, or that he had any knowledge of it, or notice that his stock was pledged for the payment of the new notes. It is not shown that he authorized Henry C. Reed, or any one else, to make such new pledge of his property. But if he had made or authorized the making of said pledge of his property in October, 1879, it appears that two years before the maturity of the last of these notes, Kelsey surrendered them to the maker, and again extended the time of payment to his debtor by accepting in lieu four other notes, the first for $300, due on demand, and the other three for $1000 each, due in one, two and three years, respectively, from their date, the last of which did not fall due until in October, 1882. This material change in the terms of the contract, without the consent of William K. Reed, was sufficient to release the undertaking that his property should stand as security. As before said, the record fails to show that he had any knowledge of, or assented to, any of these extensions, or authorized Henry. C. Reed or any other person to use his bank stock as a pledge for the performance of such new contract.

It is, however, urged, that the pledge of the bank stock was made by William K. Reed on a valuable consideration moving from Henry C. Reed; that it was substituted for the Buehler note and mortgage of $1000, the property of Henry C. Reed, and therefore the bank stock is to be treated as the property of the latter, and therefore the various extensions given to him

would not operate to release the collateral. It is true, that if a debtor pledges collaterals of his own as security for his note or bill, the extension of the time of payment will not extinguish his creditor's lien on the collaterals. If Henry C. Reed owned the Buehler note and mortgage, and consented to its exchange for the bank stock, this rule might be invoked, and become decisive of the question being considered. Did he own such note and mortgage? In October, 1874, Kelsey held in his hands various collaterals to secure the payment of the Henry C. Reed note of $7331, among which was the Buehler note and mortgage for $1000, payable to Walter Lister, dated July 11, 1873, payable two years after the date thereof. This note was indorsed by Lister, and its payment guaranteed by him. The record fails to show how it came into the hands of Kelsey, but it is fairly inferrable, from the evidence, that Henry C. Reed procured the note and mortgage from or through his brother, William K., and pledged the same to Kelsey. It appears from the testimony of George W. Reed and that of L. B. Shattuck, that this note and mortgage were, on February 2, 1874, taken by the Illinois Land and Loan Company in part payment of a debt due from Walter Lister, the payee, and that this company, on May 16, 1874, sold the same to the Dime Savings Bank, with which bank William K. Reed was connected, and of which he was an officer.

On August 2, 1874, as appears by the correspondence, Henry C. Reed requested William K. Reed to send to him (Henry) the mortgage he had spoken of, and $200 in money. That this was the Buehler mortgage, is apparent from the letter of Henry C. Reed acknowledging its receipt, and the subsequent correspondence between William K. and Kelsey, and the letter of the latter to Henry C. Reed. William K. Reed wrote to Levi Kelsey of the date of October 16, 1874: "Michael Buehler, whose note and mortgage you hold as collateral to H. C. Reed's agreement, wishes to take up his note of $1000, and have the mortgage released. I send you certificate No. 12 of

the Dime Savings Bank, for fifty shares stock belonging to me."
This shows that its hypothecation was known to William K.
Reed, and tends to strengthen the view that it had originally
come from him to Kelsey. This letter was received by Kelsey,
for in his letter of October 17, 1874, to Henry C. Reed, he
says: "Henry, I have just received a letter from William K.
Reed, asking me to send him the last mortgage that you left
with me, etc. William sends me fifty shares Dime Savings
Bank, to hold in lieu of it. Shall I do it?" The note and
mortgage were sent October 23, 1874, to William K. Reed, by
Kelsey. It also appears from the note, duly proved, that it
was paid to "William K. Reed, cashier," and that on the same
day of its payment Buehler procured a loan on the same prop-
erty from the Dime Savings Bank. The record nowhere shows
that William K. Reed or the bank was ever called upon to ac-
count for the money received on this Buehler note and mort-
gage. If, as shown, this note and mortgage belonged to William
K. Reed, no accounting would be expected, but if it belonged
to Henry C. Reed or to some other person, and had been ac-
counted for, it could have, in some way, been made apparent.

It does not appear that Kelsey, when this note and mortgage
were pledged to him, had notice that they belonged to William
K. Reed. Henry C. Reed being the holder and clothed with
the evidence of ownership of said note and mortgage, and the
same being indorsed in blank by the payee, Lister, might have
passed the title to the note to any innocent purchaser for value,
and vested the title as against William K. Reed. This being
so, Kelsey might properly take the same in pledge of Henry
C. Reed as collateral security for his debt, and no extension of
the time of payment, before notice of its being the property
of William K. Reed, would have released it from the pledge.
After notice that it belonged to William K. Reed, it was the
duty of Kelsey, the pledgee, to do nothing prejudicial to the
rights of William K. Reed as owner of such collateral. The
letter of William K. Reed of October 16, 1874, to Kelsey, in

which he sends the certificate of the bank stock, notified Kelsey that the shares of stock were the property of William K. Reed. By the same letter, Kelsey was requested to *return* the Buehler note and mortgage to him. Kelsey, acknowledging the receipt of that letter, on October 23, 1874, says: "I received your letter last Saturday, and wrote to Henry about sending the mortgage to you," etc., and inclosed the note and mortgage, as requested. We think the correspondence, when considered in connection with the letter of Kelsey to Henry C. Reed, to know if he should return the same, was sufficient notice to Kelsey of the claim of William K. Reed to the note and mortgage. Whatever is sufficient to put a reasonably prudent man upon inquiry, is to be regarded as notice of the facts such inquiry will disclose. Such inquiry, if made by Kelsey, clearly would have shown him that the note and mortgage belonged either to William K. Reed or to the bank, of which he was cashier. That Kelsey had notice of the ownership of the fifty shares of bank stock hypothecated in lieu of the Buehler note and mortgage, is clearly apparent. It can not, therefore, be said, that William K. Reed pledged his bank stock in consideration of the surrender to Henry C. Reed of the note and mortgage as his property. We have seen that the note and mortgage were not the property of Henry C. Reed, but that of William K. Reed, or of the bank, and if the latter, William K. Reed would be responsible to the bank for it. No consideration passed from Henry C. Reed for the exchange of collaterals, as neither belonged to him. It follows, therefore, that the certificate of bank stock pledged in lieu of the Buehler note and mortgage must be regarded as the property of William K. Reed, pledged as security for the payment of the note of Henry C. Reed made in 1872, and that the several extensions of the time of payment must be held to have discharged the pledgee's lien on the same.

It is insisted that the Appellate Court should have remanded the cause generally, so as that the complainant might have

proceeded further in the court below. If the decree had been reversed for variance between the allegations of the bill and the proofs, or for any reason not going to the merits of the right of complainant to recover, the practice indicated would have been proper. But the proof showing that the lien on the collateral, in respect of which relief is sought by the bill, had been released, thereby defeating the complainant's right of relief, there was no reason for remanding the cause generally.

The views expressed render it unnecessary to consider the other question discussed by counsel. Perceiving no substantial error in the judgment of the Appellate Court, it must be affirmed. *Judgment affirmed.*