# THE HOME NATIONAL BANK OF CHICAGO
## v.
# THE ESTATE OF JAMES S. WATERMAN.

*Guaranty—Debt of Another—Extension of Time without Consent—Estoppel—Corporations.*

1. Where the proper construction of a contract is doubtful, the conduct of the parties, their manner of treating it, and all the circumstances may be resorted to in order to ascertain its meaning.

2. The death of one of several guarantors works a revocation of any authority previously existing to extend the time of payment of an indebtedness.

3. A personal surety for the payment of a debt is released by an extension of the time of payment by valid agreement between the parties without his consent.

4. To render a promise to pay the debt of another an original undertaking, some benefit must move between the promisee and promisor, and the original debt must be surrendered.

5. In the case presented, the assignment of valueless claims for the benefit of the grantors does not estop the appellee from setting up the extensions of the indebtedness.

6. It is also held by this court that the agreement involved was a guaranty only; not an assumption of the indebtedness referred to therein.

[Opinion filed May 25, 1889.]

APPEAL from the Circuit Court of Kane County; the Hon. ISAAC J. WILSON, Judge, presiding.

On the 10th day of August, 1882, the Home National Bank of Chicago was, and still is, a banking corporation, duly organized and existing under the laws of the United States, and doing business as such in the city of Chicago.

On the last named date the Sycamore Marsh Harvester Manufacturing Company was a manufacturing corporation, organized and existing under the laws of the State of Illinois, and at said date, and for several years thereafter, carried on its business at Sycamore, Illinois.

On said 10th of August, 1882, said Sycamore Marsh Harvester Manufacturing Company was indebted to the said Home National Bank of Chicago, for money loaned, to the amount of $20,000, which indebtedness was evidenced by two promissory notes, each for the sum of $10,000, and each made by said Sycamore Marsh Harvester Manufacturing Company, one dated June 5, 1882, and the other dated June 26, 1882, both of which were payable in ninety days after date to, and were held by, said bank.

On the 10th day of August, 1882, said bank held, by pledge of said manufacturing company, and as collateral security to said claim of said bank against said manufacturing company, nine packages of farmers' notes, so-called (being notes originally taken by said manufacturing company for goods sold by it to farmers and others about the country), said nine packages being numbered respectively, 0,302, 0,413, 0,568, 0,653,

0,654, 0,655, 0,659, 0,662 and 0,663, the total amount of which notes, at their face value, was $21,116.71.

On said 10th day of August, 1882, C. W. Marsh, W. W. Marsh, William Loomis, James S. Waterman, Charles Brown, Charles Kellum and O. M. Bryan, being stockholders of said Sycamore Marsh Harvester Manufacturing Company, and owning a large majority of the stock of said company, executed and delivered to said bank their written agreement, of which the following is a copy:

"C. W. MARSH, Pres.        W. W. MARSH, Supt.

"J. S. WATERMAN, V.-Pres.    A. M. STARK, Sec. and Treas.
"Incorporated March 31, 1869.

"OFFICE OF THE SYCAMORE MARSH HARVESTER MANUFACTURING COMPANY,

"SYCAMORE, DeKalb Co., Ill., August 10, 1882.

"GEO. W. FULLER, Esq., Cashier Home National Bank, Chicago, Ill.

"*Dear Sir:*  We, the subscribers, stockholders of the Sycamore Marsh Harvester Manufacturing Company, hereby guarantee, if you will deliver to C. W. Marsh, president, or to A. M. Stark, secretary of said company, the farmers' notes now held by your bank as collateral to its claims against our said company (said notes being contained in packages 0,302, 0,413, 0,568, 0,653, 0,654, 0,655, 0,659, 0,662, 0,663—total $21,116.71), for the purpose of collection, that said collaterals shall be replaced by others equally acceptable to you in character and amount during the month of February, or if not that you shall be paid on or before March 1, 1883, such proportion of our company's debt, or any extension thereof made in the meantime, in cash, as said farmers' notes are held to secure. For the faithful performance of these conditions we hereby bind ourselves to and with you as the cashier of said bank.

"C. W. MARSH,

"W. W. MARSH,

"WILLIAM LOOMIS,

"J. S. WATERMAN,

"CHAS. BROWN,

"CHAS. KELLUM,

"O. M. BRYAN."

That thereupon, in consideration of the delivery of said paper to said bank, and of the undertaking of the signers thereof therein expressed, said bank delivered to said C. W. Marsh, for said manufacturing company, as president, said nine packages of farmers' notes, and said Marsh thereupon receipted for the same, said receipt therefor being indorsed on the back of said contract and now appearing thereon.

The notes thus delivered to C. W. Marsh for said company aforesaid were sent by it to a bank at Lincoln, Nebraska, for collection, and they were paid in part and the money received by the manufacturing company.

That said collaterals, said farmers' notes, were not replaced by others during the month of February, 1883, as contemplated and provided in and by said contract, nor were the same at any time after said 10th day of August, 1882, either returned or replaced by others, as contemplated by said contract.

Neither was said bank paid its said indebtedness referred to in said contract on or before March 1, 1883, as therein provided, nor has it ever been paid said indebtedness in full, but the amount of $16,605.49 remains unpaid, figuring interest to February 7, 1888.

James S. Waterman, one of the signers of the agreement of August 10, 1882, departed this life on the 19th day of July, 1883, leaving a last will and testament, which was duly proven in the County Court of DeKalb county, in which court the estate of deceased is being administered, Philander M. Alden and George S. Robinson being the executors of said will.

On the first of July, 1884, the claim of the Home National Bank against said estate, based upon said agreement of August 10, 1882, was filed in said County Court, there being then due said bank on account of said indebtedness referred to in said agreement, $15,932.99. A final determination of said claim, adversely to the bank, was made by said court on the 24th day of May, 1887, and an appeal was taken by the bank to the Circuit Court of DeKalb county, and because of the interests of the judge presiding in that court, the venue was changed to the Circuit Court of Kane county. The case was by agreement of parties submitted to the court for trial without a jury.

A hearing was had on the 6th and 7th days of February, 1888. On the 7th day of May, 1888, the court finds for the defendant and the plaintiff appeals to this court.

While the foregoing facts, which are not controverted, are the principal ones upon which the claim of the bank is based, yet there are many others which have been made to appear from the evidence.

Additional and subordinate facts in the case:

The said indebtedness of said Harvester Manufacturing Company to said bank was extended from time to time upon the application of said company, until the 30th day of June, 1884, there being then due the said bank on account of said indebtedness the sum of $15,925.49, the difference between that amount and the sum of $20,000 having been paid by said company in the meantime. That of the whole number of extensions, four extensions were made before the 19th of July, 1883, and three extensions were made after that date.

That at the several times at which said indebtedness was extended, between said 10th day of August, 1882, and the 30th day of June, 1884, the day of the entry of judgment thereon as hereinafter stated, the old notes executed by said Sycamore Marsh Harvester Manufacturing Company given therefor were surrendered, and new notes executed by the said company were given for said indebtedness. That not only the notes originally given to evidence such indebtedness, but all subsequent notes given upon the several extensions of such indebtedness, were what are called "judgment notes," having attached thereto as a part thereof a power of attorney authorizing the entry of judgment upon said notes at the option of the holder thereof, either before or after the same were due, according to the terms thereof.

This is appellee's statement and is added:

The indebtedness of the Sycamore Harvester Manufacturing Company to the Home National Bank being in two notes, each for $10,000, at the time the agreement guaranty was made, continued to be renewed from time to time for the same sums respectively until November 28, 1883. On October 3, 1883, after the death of J. S. Waterman, one of the $10,000

notes had been renewed as usual. On November 28, 1883, the other $10,000 note was divided into two notes, one for $5,500 and the other for $4,500. On January 16, 1884, the $4,500 note was paid from the proceeds of drafts drawn by the maker, the Harvester Company, upon the Lincoln National Bank, which drafts had been deposited with the note for $4,500 when it was given, and were payable at its maturity. At the time of giving this $4,500 note and the deposit of the drafts above mentioned, the Home National Bank surrendered to the Harvester Company all the farmers' notes remaining in its hands, which had been deposited as collateral for the whole indebtedness, and which then amounted to about $8,000. At least three extensions of the notes representing the indebtedness of the company were made after the death of James S. Waterman, which occurred on July 19, 1883.

That some time before the death of Waterman, a corporation called the Marsh Binder Manufacturing Company, had been organized under the laws of the State of Illinois, the stockholders in which were substantially the same as those in the Sycamore Marsh Harvester Manufacturing Company, the said C. W. Marsh being president of both said companies, and until his death the said J. S. Waterman being director and vice-president of both said companies. That said Marsh Binder Manufacturing Company, upon its organization, succeeded to the plant and manufacturing business of the Sycamore Marsh Harvester Manufacturing Company, and from thence the assets of the last named company consisted principally in the stock of the binder company, old machines and bills and accounts receivable.

That on the 30th day of June, 1884, a number of judgments were entered against said Sycamore Marsh Harvester Manufacturing Company and against said Marsh Binder Manufacturing Company, respectively ; and on the same day said Marsh Binder Manufacturing Company made an assignment for the benefit of its creditors, under the insolvent laws of the State of Illinois.

That while said Sycamore Marsh Harvester Manufacturing Company had on said 30th day of June, 1884, become unable

to pay all its liabilities as the same matured, yet it had a very large amount of assets, among which was a large number of doubtful and desperate farmers' notes, the greater portion of which were in the hands of C. W. Mosher, Lincoln, Nebraska, for collection. It also had accounts and agricultural implements in the hands of the agents of said company, all of such assets aggregating nearly $200,000 of supposed value, an amount of assets supposed by the officers of the manufacturing company to be quite sufficient to pay ultimately all its debts and liabilities, but it turned out differently.

That on said 30th day of June, 1884, said Home National Bank having heard of the entry of said judgments and of said assignment, procured a judgment to be entered in its favor against said Sycamore Marsh Harvester Manufacturing Company for said sum of $15,925.49, the balance of said indebtedness of $20,000 then due said bank, said judgment being entered in the Superior Court of said Cook county, in said State of Illinois, upon which judgment execution was immediately issued, but nothing could be made thereon.

That no part of the said indebtedness evidenced by said judgment after its rendition has ever been paid to said bank.

That shortly previous to the entry of said judgment against said Harvester Manufacturing Company and the assignment of said Binder Manufacturing Company, to wit, on the 20th day of June, 1884, said Binder Manufacturing Company transferred to said Harvester Manufacturing Company, by bill of sale, a quantity of harvesters and binders then in the hands of certain agents of said Binder Company; and at the same time said Binder Company transferred to said Harvester Company three certain commission contracts referred to in said bill of sale.

That afterward, on the 2d day of August, 1884, said Sycamore Marsh Harvester Manufacturing Company, by its contract in writing then entered into, to which contract the then living signers of said agreement of August 10, 1882, and the executors of said Waterman's estate were parties, duly assigned and transferred to Charles Kellum the interest of said Harvester Company in upward of $200,000 in amount of farmers' notes, then in the hands of one C. W. Mosher, but belonging

to said Harvester Company (subject to certain liens thereon in favor of said Mosher, amounting to about $57,000), which transfer of said notes or the proceeds thereof to said Kellum was made for certain purposes in said agreement of August 2, 1884, specified among which purposes was the following: "For the security of the signers of said writing to said Home National Bank on their liability on said writing," meaning said agreement of August 10, 1882. Said farmers' notes by said contract of August 2, 1884, assigned to said Kellum as security as aforesaid, are still under the control of said Kellum as trustee for himself and associates signing said agreement of August 10, 1882, subject to the claims, if any there be unpaid, of said Mosher against the same as aforesaid.

Mr. Charles D. F. Smith, for appellant.

The contract in question is an original undertaking, and not a collateral one. It is not a mere guaranty of the debt of another. A contract of guaranty, in general, is a "collateral engagement to answer for the debt, default or miscarriage of another," as distinguished from an original and direct engagement for the parties' own act. Chitty on Contracts, 10th Am. Ed., 546. If the contract in question is a contract of guaranty, in the sense that it is an engagement to answer for the debt or default of another, it must have been in writing.

If, on the other hand, it is an original and direct engagement for the party's own act, it would be binding though not in writing. Hence, those authorities which tend to determine whether the contract in question is one which must be in writing, or one in which writing may be dispensed with, will aid in determining whether this is a contract of guaranty or an original and direct engagement of the parties entering into it, binding upon such parties in the first instance and at all events. Says Chitty: "Whether the engagement was original or collateral—that is, whether it was binding on the party in the first instance and at all events, or only in case the other party made default—depends on the contract between the parties. But this is to be collected, not altogether from the particular words of the guaranty or promise of the defendant, but from

the circumstances in each case, and the general features of the transaction." Chitty on Contracts, 10th Am. Ed., p. 557. In Blank v. Dreher et al., 25 Ill., 293, the court say: "Whether an undertaking is original or collateral merely, is to be determined, not from the particular words used, but from all the circumstances attending the transaction. Both the terms of this contract and the circumstances of the transaction show the nature of the contract." The use of the word "guaranty" does not necessarily indicate that the undertaking is collateral and not an original undertaking. The word is often used in the sense of "promise" or "agree."

Although a contract be apparently a contract to pay the debt of another, yet it may be an original undertaking as distinguished from a collateral undertaking to guarantee or answer for the debt of another, and be binding upon the party entering into it, notwithstanding the contract may not be in writing, because it is an original undertaking and not a collateral one. Says Chitty: "It has been said that although the debt of another formed the subject-matter of the defendant's undertaking, still if he promised to pay the debt upon some new consideration raised by himself, and the consideration was the creditors' resignation of a charge or lien on goods, which afforded him a remedy or fund to enforce payment, the case does not fall within the statute. And it may be stated as a general rule, that whenever the leading object and main purpose of a promise is a benefit to the promisor which he did not enjoy before, it is not within the Statute of Frauds, although its effect may be to discharge another from a debt or obligation." (Chitty on Contracts, 10th Am. Ed., 560, 561.)

In the case of Leonard v. Vredenburg, 8 Johns. 29, Kent, Ch. J., thus states the law: "But, if a promise to pay the debt of another be founded on a new and distinct consideration, independent of the debt, and one moving between the parties to the new promise, it is not a case within the statute. It is considered in the light of an original promise. The case of Williams v. Leper proceeds upon this distinction, and the point is too clearly settled to be questioned." In this case the learned chief justice says: "There are then three distinct classes

of cases on this subject, which require to be discriminated. First, cases in which the guaranty or promise is collateral to the principal contract, but is made at the same time, and becomes an essential ground of the credit given to the principal or direct debtor. Second, cases in which the collateral undertaking is subsequent to the creation of the debt, and was not the inducement to it, though the subsisting liability is the ground of the promise, without any distinct and unconnected inducement. * ·* * Third. A third class of cases, and to which I have already alluded, is when the promise to pay the debt of another arises out of some new and original consideration of benefit or harm moving between the newly contracting parties. The first two classes of cases are within the statute of frauds, but the last is not."

This case of Leonard v. Vredenburg, 8 Johns. 39, is often referred to by the courts, and is referred to and approved in Smith v. Finch, 2 Scammon, 321, which case holds the law to be that "when the promise to pay the debt of another arises out of some new and original consideration of benefit or harm between the newly contracting parties, the consideration is sufficient," and in such cases the statute does not apply. See also Nelson v. Boynton, 3 Metc. 96; Clifford v. Luhring, 69 Ill. 401; Bunting v. Darbyshire, 75 Ill. 408; Curtis v. Brown, 5 Cush. 491; Borchsenius v. Canutson, 100 Ill. 82; Allen v. Thompson, 10 N. H. 32.

Messrs. WILSON & MOORE, for appellee.

The contract was a conditional one, based upon a contingent act of the bank to which it was addressed: " If you will deliver to C. W. Marsh, president * * * the farmers' notes now held by your bank, * * * you shall be paid," etc.

This was a mere proposition, which the bank had a right to decline, and, so far as the makers knew, may have declined. There is not only no evidence of the giving of any notice of acceptance, but it is particularly shown that there was no notice of acceptance.

Without this notice the contract never became binding.

In Oakes v. Wells, 13 Vt. 106, it was held that a guarantor is entitled to notice of the acceptance of his guaranty unless it is absolute in its terms. If a man writes, "If you will do such a service for so and so I will pay you," it is equivalent to " Do it for him and notify me in a reasonable time, and I will pay you."

Is the delivery of the notes by the bank, in pursuance of this agreement, to be treated as a delivery to the guarantors? Counsel for the bank so claims, solely on the ground that the makers of the guaranty were stockholders of the company, and that a delivery to the company amounts to a delivery to them. This assumes that a few of the stockholders are the same as the company—an assumption which is founded upon a misapplication of certain language of Morawetz in his book on corporations; the language being, even as used by Morawetz, a mere theoretical proposition of his own, which is not sustained by authorities, and is not recognized as law, to wit: that the incorporators and the incorporation are one and the same, and that the property of the corporation belongs to the corporators. All the other text books take precisely the opposite view of a corporation, and distinguish it in express language from the persons who compose it; and all the decisions, so far as we have been able to ascertain, where the question arises, make a radical distinction. The Supreme Court of Michigan, in the case of Hansen v. Donkersley, 37 Mich. 134, decided that the individual liability of the stockholders in the corporation was, under the statutes of Michigan, a secondary liability, in the nature of a guaranty, and was released by an extension of time given to the company in taking its note for the debt. See also Witters v. Sowles, 32 Fed. Rep. 767.

It has been held, and is now the accepted doctrine, that shares of stock are personal property, although all the property of the company is real estate. The share of stock is simply a right to such a proportion of the net assets of the company in distribution, and is not in any sense an interest in the assets. If it were so, all the stockholders must necessarily be parties defendant to a foreclosure suit against the company,

or, in ejectment, must be co-defendants. The stockholders are indeed in a way interested in the prosperity and success of the company; probably but for that they could not have been induced to sign the guaranty; but their interest is not so direct that the benefit the corporation got in delivering up securities, can with any reason be said to accrue to them. This company was heavily in debt; all its assets, including these securities, were required to pay its debts, and none of them were expected to, or did in fact, benefit the stockholders in the least. They were not indebted for their stock; the return of the securities could not even tend to relieve them of their liability. But further no benefit would have been derived, in any event, without showing that this security was collected by means of the delivery to the company, and would not have been, if retained by the bank; otherwise no benefit accrued to anybody. Decisions are very numerous, holding, that notwithstanding an incidental benefit may accrue to the promisor, it is not sufficient to make him liable, even on a direct promise to pay the debt of another, unless it was so definite and appreciable as to raise an implied *assumpsit*, and, without the promise, he would have been bound to pay. See Smith's Leading Cases (8th Ed.), p. 559.

However this may be, it is clear that a part of the stockholders do not comprise the company, and can not be treated as identical with it, even on authority of Morawetz.

It is not necessary for us to cite authorities to the effect that an extension of time to the principal discharges the surety. Upon this subject we will refer only to the case of Dodgson v. Henderson, 113 Ill. 360. In that case it was held that the promise of a maker of a note which had matured to keep the money for another year, and pay the same interest as before, is a sufficient consideration for an extension of time by the holder of the note, and that where such an agreement was made without the consent of the surety he is discharged.

This is clearly a contract of guaranty only, the debt being still that of the company, and the promise being that the company should pay it, or such extensions as should be made before March 1, 1883. It was extended repeatedly after that

time, always with the president of the company, and never, as the evidence shows, either with the knowledge or consent of either of the other sureties. If it could be inferred, however, that Waterman, who nominally held an office in the company, which was not then in business and connected with which he had no duties, ought to be charged with notice, yet certainly that would end at the time of his death on July 19, 1883; but both these notes, now merged in judgment, were extended at least three times after that date, and the evidence shows that this was entirely without the knowledge or consent of his executors, even assuming that they had power to consent.

LACEY, P. J. The main question in this case is, was the agreement executed by J. S. Waterman, deceased, and others, August 10, 1882, an original agreement between appellant and the makers thereof, or was it a collateral one holding the relation of a guarantee of the debt of the Sycamore Marsh Harvesting Company to appellant? If the latter, the extension of the time of the payment of the principal debt without the consent of Waterman in his lifetime, or his administrators after his death, would work a release of the said appellee, the executor of Waterman, from liability. The time of payment was extended by the parties thereto by a valid and binding agreement some three different times, without the appellee's consent and after the death of Waterman.

We have carefully read and considered the able and carefully prepared argument of both the appellant's and appellee's counsel, and have also examined some authorities not referred to, and we find the authorities on the question not entirely uniform and not easily reconcilable, but we think the weight of authority, and especially in this State, is in favor of holding that the agreement was collateral and was not an absolute assumption of the original indebtedness of the Sycamore Marsh Harvesting Company as is contended for by appellant's counsel. We regard the agreement as one of guaranty only, and a mere substitution by the Sycamore Marsh Harvesting Manufacturing Company, of the responsibility of the signers of the agreement for the collateral securities held by the appel-

lant and delivered over to the said company upon the delivery
of the agreement to appellant. It will be noticed that the
agreement expresses on its face that it is a guaranty, and it
has ever been so treated by all the parties since its execution.
The principal debt was not surrendered, but renewed from
time to time, and finally passed into a judgment in favor of
appellant and against the debtor company, and is still in a sub-
sisting judgment.

It is a well recognized rule of law that if there is anything
doubtful in the construction of a contract, the conduct of the
parties, their manner of treating it, and all the circumstances,
may be resorted to for the purpose of ascertaining its true
meaning. Burgess v. Rodgers, 124 Ill. 288. It is contended
by appellant that, as the agreement speaks of a possibility of
renewal, it gave authority to the Sycamore Marsh Harvesting
Company and appellant to renew without additional consent
of Waterman. Without stopping to inquire what the true
interpretation would be if Waterman had been alive when the
three last renewals were made, we understand the law to be
that any power of that description would be revoked by the
death of the party giving it. The death of Waterman worked
a revocation of any authority to extend the time of payment
of the original debt that may have existed prior to that time.
Risley v. Fellows, 5 Gilm. 531.

In case collateral security is put up by a third party, or a
third party becomes security for the payment of principal
indebtedness, and the time of payment of such indebtedness
is extended by valid agreement by the parties thereto without
the consent of the owner of the collaterals or the personal
security, such action has the effect in law to release the collat-
erals or the security, as the case may be. Reed v. Cramb, 22
Ill. App. 34, and some case affirmed by title of Price v. Dime
Savings Bank, 124 Ill. 317.

Again, recurring to the question of whether the agreement
of August 10, 1882, was in the nature of an original agree-
ment, we can say, as we before said, that it is not free from
embarrassment. But it appears to be well settled that, in
order that the promisor should become principal, there

should be some benefit moving between the promisee and promisor, who undertakes to pay the debt of another, and that such consideration should be of some direct advantage to such promisor, in order to make it an original debt and divest it of the character of a mere security, and the original debt must be given up. Borchsenius v. Canutson, 100 Ill. 92; Eddy v. Roberts, 17 Ill. 505; Wilson v. Bevan, 58 Ill. 232; Hardy Bros. v. Warner, 88 Ill. 561; Williams v. Corbitt, 28 Ill. 262; Hughes v. Hughes, 41 Ill. 214; Bunting v. Darbyshire, 75 Ill. 408; Murto v. McKnight, 29 Ill. App. 238; Ames v. Foster, 106 Mass. 403; Westhumer v. Peacock, 2 Clark, 529. See, for an extreme case, as making the promise assume the character of a new indebtedness, Allen v. Thompson, 10 N. Y. 32.

The collaterals in this case were not delivered to the makers of the agreement nor for their benefit, but to the Sycamore Marsh Harvesting Company, as the receipt shows; hence they received no benefit, directly or indirectly, therefrom, except as stockholders of the corporation, nor was the original debt satisfied or given up. Opposed, however, to the Illinois cases above cited on the question of the extinguishment of the original debt, may be, to some extent, the case of Foley v. Cleveland, 4 Cow. 439.

The appellant raises the question that the appellee is estopped on account of the assignment of old accounts and other assets of the Harvesting Company to Judge Kellum for the benefit of the signers of the agreement. This, no doubt, would be a good point, at least to the amount received, but we fail to find from the evidence that anything was ever received or ever will be. The accounts appear to have been uncollectible, at least to any greater extent than they had been previously pledged, and there was nothing left of the other assets.

Taking the case as a whole, we must hold that Waterman, on account of the extensions of the time of payment, and the taking new notes from the Sycamore Marsh Harvesting Company and delivering up the old ones to the original debtor after Waterman's death and without appellees' consent, releases

the latter, as executor of Waterman's estate, from the obligation as surety.   The judgment of the court below is therefore affirmed.

*Judgment affirmed.*

C. B. SMITH, J., dissenting.   I do not agree with either the argument or conclusions of the majority of the court in this case, but hold that the judgment of the court is neither supported by the facts nor the law in the case.   I shall not enter upon a general discussion of the case, but content myself with a single observation or two.   I hold that, under all the facts disclosed by the evidence in the case, the agreement of March 10, 1882, signed by Waterman and others, was, beyond all doubt, an original undertaking to pay the bank if it would part with the farmers' notes which it held as collateral security, notwithstanding it is called a guaranty.

The farmers' notes were to be delivered to the Marsh Harvester Company for its own benefit, and the Marsh Harvester Company was but another name for the signers of the agreement, including Waterman.   They were the chief and principal stockholders and owners of the failing and bankrupt Harvesting Company, and they were carrying on the business under the corporate name almost exclusively for their own use and benefit.   It was a private affair, composed very largely of the parties to this agreement, who owned nearly all the stock. They borrowed the money from the bank for their own private benefit; they again induced the bank to give up its collaterals for their own private benefit and to pay other debts. Three of these very men who signed this agreement—the two Marsh's and Waterman—are the chief officers of this private corporation, controlling and managing it for themselves and their co-contractors and stockholders for their own private benefit, and these facts abundantly appear from the proof in the case.   Instead, therefore, of Waterman and the other makers of this contract of August 10, 1882, being mere sureties or guarantors, they were the direct and almost exclusive beneficiaries of the notes procured from the bank, and the mere fact that they were doing business under the cloak of a

private corporation instead of a firm where the stockholders and the partners were the identical same persons, can not deprive the transaction of its real character, nor change the fact that the men who made the contract were also the men who received nearly the entire consideration for its execution. It is a matter of no importance that the several packages of farmers' notes these men secured from the bank by this contract were not worth their face. They were (on the face) worth more than the amount the Harvesting Company owed the bank, and formed an ample consideration for the execution of the contract. Considering, then, the relation of Waterman and the others (who signed the contract) to the private corporation and the bank, it seems to me to be a perversion of the use of language to say that these men were mere guarantors or volunteers, without valuable considerations and without a direct personal interest in the transaction, so as to entitle them to the consideration and protection which the law justly and wisely throws around those who are sureties and guarantors in fact and in truth, without any consideration for their undertaking. I have no controversy with the majority of the court as to what the law is in the many cases cited, holding that a real guarantor or surety in fact will be released by extensions of the principal debt, without their consent, for a valuable consideration, and especially so after the guarantor is dead, but I hold that such authorities have no relation or application to a case where the proof shows that the relation of guarantor or surety does not exist.

Believing, as I do, that the contract of August 10, 1882, set out in the opinion of the court, is an original and independent undertaking, upon a sufficient and valuable consideration moving to the makers thereof, it is then wholly immaterial how many extensions the bank may have made of the original notes. It would not release a principal maker. The judgment of the court below was wrong, and ought to be reversed.