444 F.2d 1077
 9 UCC Rep.Serv. 882
 In the Matter of SECURITIES AND EXCHANGE COMMISSION, Plaintiff,
v.
H. L. RODGER & BRO., a partnership, et al.,
Defendants-Appellees, v. Gladys B. BEAK, Executrix
of the Last Will of Robert M. Beak,
Deceased, Petitioner-Appellant.
 No. 18709.
 United States Court of Appeals, Seventh Circuit.
 June 29, 1971, Rehearing Denied July 27, 1971.
 
 Vincent G. Rinn, Samuel W. Miller, Denis J. Owens, Owens, Owens & Rinn, Chicago, Ill., for petitioner-appellant.
 Melvin S. Newman, Avrum H. Dannen, Chicago, Ill., for defendants-appellees.
 Before SWYGERT, Chief Judge, CASTLE, Senior Circuit Judge, and CUMMINGS, Circuit Judge.
 SWYGERT, Chief Judge.
 
 
 1
 This is an appeal from a denial of a petition for reclamation filed in the receivership of a defunct stock brokerage firm. The underlying receivership proceeding was instituted by the Securities and Exchange Commission against H. L. Rodger & Bro. (Rodger), a registered broker-dealer in securities. During the course of the receivership, Robert M. Beak[1] filed a petition for reclamation of certain securities allegedly valued in excess of $80,000, which, at the time of the appointment of the receiver, were held to a large extent by the First National Bank of Chicago as security for a loan extended to Rodger. Beak, as the registered owner of the securities, had previously loaned them to his friend John Pini, the general manager of Rodger. The character and effect of this loan transaction is the critical issue in this litigation. The essential facts follow.
 
 
 2
 Prior to 1966, Rodger was owned and operated by two partners, Rosie Williams and Roy Minger. The firm was located in Joliet, Illinois and was a member of the Midwest Stock Exchange. In the latter part of 1965, Pini negotiated with Williams and Minger for the purchase of Rodger. They arrived at an agreement just before Williams died in February 1966. Bur because an officer of the Midwest Stock Exchange had informed Pini that he could not become a partner in Rodger until he had been approved by the exchange, Pini arranged that one Burney Simpson would become Minger's partner in the firm by purchasing Williams' interest from his estate. Minger was to remain as a one percent partner in the firm until such time as the exchange approved Pini. Accordingly, Minger withdrew over $30,000 from Rodger's bank account in order to reduce his partnership interest to one percent. Thereafter Simpson and Minger operated the firm as partners with Pini as its general manager.
 
 
 3
 After assuming the position of general manager in March 1966, Pini began borrowing various sums from Rodger for his personal use. These loans approximated $80,000 by the end of September 1966. Under the rules of the Midwest Stock Exchange and the Securities and Exchange Commission, unsecured loans are charged against capital. Because a surprise audit of Rodger was started on September 30 by a certified public accountant under the aegis of the exchange, it became necessary for Pini to act promptly if the firm was to retain its exchange membership. Accordingly, on October 3 Pini prevailed upon Beak to deliver to him a number of publicly traded stocks and bonds owned by Beak (the securities here in question) upon an understanding that the securities would be deposited by Pini with Rodger to secure Pini's borrowings.
 
 
 4
 Coincident with the delivery of the certificates, Pini executed a receipt to Beak which read in part:
 
 
 5
 Received of Robert M. Beak the following securities which are to be returned to him October 10. The firm and me are jointly responsible as to the return of these securities, and under no circumstances are any of them to be converted.
 
 
 6
 The receipt was signed H. L. Rodger by John Pini. After receiving advice from an office employee who was a former auditor with the Midwest Stock Exchange that the receipt would not meet the requirements of the exchange, Pini drafted a second receipt which read in part:
 
 
 7
 Received of Robert M. Beak the following securities which are to be used as collateral to secure a loan made to John O. Pini by H. L. Rodger & Bor.
 
 
 8
 This second receipt was signed by Robert M. Beak as 'lender' and John O. Pini as 'borrower.' Both receipts were predated June 1, 1966.
 
 
 9
 Shortly after receiving the securities, Pini delivered them to Rodger. Thereafter, on October 11, 1966, Pini as 'lender' and Simpson and Minger on behalf of Rodger as 'borrower,' executed a document entitled 'Subordinated Loan Agreement' without Beak's knowledge. The document listed the securities that had been delivered to Pini by Beak. In pertinent part the agreement provided that, 'The borrower may use the borrowed securities in its business and shall have full power and authority to hypothecate said securities to secure loans from banks or other lenders.' On the basis of this agreement, the First National Bank on October 11 loaned Rodger $56,000 and took possession of Beak's securities as collateral for the loan.
 
 
 10
 Beak's basic contention is that under the facts a suretyship was established with Pini as debtor, Rodger as creditor, and Beak as surety. Upon that premise, Beak argues that under well established principles of suretyship law, his obligation as surety terminated upon the making of the subordinated loan agreement and Rodger's deposit of his securities with the bank as collateral.
 
 
 11
 The district judge in considering this contention concluded that the dealings between Beak and Pini showed only that Beak made a 'personal' loan of his securities to Pini and that there was no intention that Beak should become a surety for Pini's indebtedness. In reaching that conclusion the judge pointed to the fact that the two documents designated as receipts did not reflect any promise of a 'personal liability' by Beak to pay Pini's debt upon default. He also alluded to the fact that the partners of Rodger had no dealings with Beak and no knowledge that Beak claimed an interest in the securities. We are of the view, however, that these purported deficiencies do not stand in the way of a determination that a suretyship was established.
 
 
 12
 The rule is settled that when a debtor pledges property, such as securities, to his creditor as security for his debt and the property has been loaned to the debtor by a third party for such purpose, the third party occupies the position of surety to the extent of the pledged property if the creditor has notice of the purpose of the loan by the third party. Boulter v. Joliet Nat'l Bank, 217 Ill.App. 330 (1920); Price v. Reed, 124 Ill. 317, 15 N.E. 754 (1888); Restatement of Security 36 (1941). No promise by the third party to pay the debt is necessary because the loan of the property as a pledge is considered a prepayment, pro tanto, of the obligation that is conditioned upon default.
 
 
 13
 Although the rule requires that the creditor have notice of the loan arrangement between the third party and the debtor, such notice need not be actual; constructive notice is sufficient. In the situation before us it was the latter. The knowledge of Pini as general manager of Rodger concerning the purpose of his loan of Beak's securities must be imputed to the partners of Rodger. When the loan was advanced Pini was acting within the scope of his authority. The fact that he occupied simultaneous roles-- Rodger's dobtor and its agent-- does not detract from the imputation of his knowledge to the partners. Contrary to the defendant's contention that Pini's interest in obtaining Beak's securities to secure his debt was adverse to Rodger's interest, the two interests were completely compatible. Pini, as Rodger's agent, had to find collateral for any outstanding unsecured loans or Rodger would be in danger of losing its exchange membership.
 
 
 14
 Although the district court considered together the two receipts executed by Pini and Beak, and the testimony of both Beak and Pini lends some support to that view, the second document should be considered a complete substitute for the initial one. They are literally contrary in import. Moreover, it was understood at the time the second receipt was signed that the first receipt would not be acceptable to the Midwest Stock Exchange. The second document, without referring to the first, states unequivocally that the securities were being loaned to Pini for the purpose of securing his indebtedness to Rodger. Understandably, the second receipt made no mention of a time limitation since its purpose was to furnish the security that Pini needed to satisfy the demands of the exchange.
 
 
 15
 Our analysis of the second receipt and the relationship between Beak, Pini, and Rodger convinces us that Beak occupied the position of a surety and was entitled to all the protections the law affords to one in that status. While we agree with Beak up to this point, we conclude that he was not entitled to reclaim his securities because he has not pointed to any action by Rodger which would operate to discharge him as surety.
 
 
 16
 The general rule is that conduct by a creditor which alters or modifies the principal debtor's obligation, e.g., an extension of time for performance, releases a surety. In this case, there is no evidence that either Rodger or Pini did anything which affected Pini's debt. So far as the record shows, there was no extension of time, no further credit was extended to Pini, nor has any payment been made by him. To establish that he was released as a surety and that his property was discharged from any claims of Rodger, Beak relied on what he terms the 'conversion' of his property by Pini andRodger. Beak argues that this conversion was accomplished by the execution of the 'Subordinated Loan Agreement,' which purported to give Rodger the power to use Beak's securities in its business, and by Rodger's subsequent use of the securities as collateral to obtain a $56,000 loan from the First National Bank.
 
 
 17
 The facts of this case show that Rodger merely repledged Beak's stock to the First National Bank. While unauthorized use of pledged collateral is a conversion, a repledge of the collateral as security for a debt of the pledgee is not considered a use prohibited by the pledgor-pledgee relationship, at least where the repledge is for a claim smaller than that for which the collateral was initially pledged. Restatement of Security 23, comment (b) (1941). See Bradley v. Parks, 83 Ill. 169 (1876); Belden v. Perkins, 78 Ill. 449 (1875); Talty v. Freedman's Savings & Trust Co., 93 U.s. 321, 23 L.Ed. 886 (1876); Ill.Rev.Stat. ch. 26, 9-207(2)(e) (1969). Rodger's repledge of Beak's securities neither altered the risk undertaken by Beak nor impaired his ability to redeem his securities if Pini paid the principal debt. The repledge was not a conversion.
 
 
 18
 We do not agree with Beak's assertion that the execution of the 'subordinated Loan Agreement' constituted a conversion. As indicated, both Pini and Rodger had notice of Beak's interest in the pledged securities and of the limited purpose for which they were authorized to possess them. They could not, by their unilateral act, give themselves any better title to the securities than Beak had granted to Pini. So far as the relationship between Beak, Pini, and Rodger is concerned, the 'Subordinated Loan Agreement' was a nullity, and these parties remained in the same position as they would have occupied had the agreement never been executed. The mere execution of the loan agreement under the circumstances was not a conversion.
 
 
 19
 Moreover, there is no showing in the record that Pini ever paid any part of his debt to Rodger. Until Pini paid, Beak was not harmed by Rodger's continued possession of the securities or by its repledge of them, and he is not entitled to their return. In an action for the return of pledged property, the pledgor is required to prove that he has paid or tendered payment of the secured obligation. Talty v. Freedman's Savings & Trust Co., supra.
 
 
 20
 When Beak delivered to Pini the thirty certificates representing the loaned securities, eight of the certificates did not bear the endorsement of Beak. Subsequent to the delivery of the securities to the First National Bank, Pini signed the name of Robert M. Beak to blank stock powers, sufficient in number for each of these eight certificates. Beak contends that the action of Pini constituted a forgery.
 
 
 21
 In denying Beak's contention, the district court ruled that since it was the manifest intention of both Beak and Pini that all the securities listed in the receipts should be used as collateral for Pini's indebtedness to Rodger, Pini had the implied authority to endorse the blank certificates. As the judge observed, 'Certainly Pini and Beak did not intend the unendorsed securities to be any less usefull to Pini than the balance of the package.'
 
 
 22
 Because of the implied authority granted Pini, he was an 'appropriate person' within the definition of that term under Ill.Rev.Stat. ch. 26, 8-308 (1969), which describes those who may transfer or assign a registered security. Under that section an appropriate person includes an authorized agent of the owner of the security.
 
 
 23
 The judgment is affirmed.
 
 
 
 [1]
 Prior to the district court's ruling, Beak died, and the executrix of his estate was substituted as the claimant. For convenience we will continue to refer to claimant as 'beak' throughout this opinion